UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|                                          |   |                          |
|------------------------------------------|---|--------------------------|
| ERNEST WEBBER                            | : |                          |
|                                          | : |                          |
| V.                                       | : | CIV. NO. 3:09CV0745 (WWE) |
|                                          | : |                          |
| MICHAEL J. ASTRUE, COMMISSIONER          | : |                          |
| SOCIAL SECURITY ADMINISTRATION           | : |                          |
|                                          | : |                          |

RECOMMENDED RULING

This action, filed under § 205(g) of the Social Security

Act, 42 U.S.C. § 405(g), seeks review of a final decision of the

Commissioner of Social Security, in which he found that the

plaintiff was not entitled to Supplemental Security Income

("SSI") benefits after October 1, 2004, because, despite his

impairments, he had the residual functional capacity ("RFC") to

perform light work that allowed him to perform jobs that existed

in significant numbers in the national economy.

For the reasons that follow, plaintiff's Motion for Order

Reversing the Decision of the Commissioner [**Doc. #16**] is **DENIED**

and Defendant's Motion for Order Affirming the Decision of the

Commissioner [**Doc. #19**] is **GRANTED.**

I. ADMINISTRATIVE PROCEEDINGS

The plaintiff applied for disability on May 25, 1995 and was

found disabled as of October 9, 1994. On October 24, 2004, the

plaintiff was notified that he was no longer disabled as of

October 1, 2004. (Tr. 18, 20, 28-30, 34-35A, 64[1]). A Disability Hearing Officer confirmed the Disability Cessation upon reconsideration on March 28, 2005. (Tr. 43, 46-56, 59-70, 71-72, 77).

On July 10, 2007, Administrative Law Judge ("ALJ") Addison C. S. Masengill held a Video Hearing at which plaintiff testified without the assistance of counsel.[2] (Tr. 447-75). On August 30, 2007, the ALJ issued an unfavorable decision. (Tr. 15). The ALJ concluded that claimant was no longer disabled as of October 1, 2004, when there was a decrease in the medical severity of the impairments present at the time of his last comparison point decision ("CPD") from the Medical Review continuing disability review ("CDR") on February 11, 1997. (Tr. 18-24, 29-30, 64, 251, 298).

The Decision Review Board denied the plaintiff's request for review on February 27, 2009. (Tr. 5). Thus, the ALJ's July 10, 2007 decision is the final decision of the Commissioner, subject to judicial review. (Tr. 5-6). Plaintiff has appealed to this Court, appearing pro se.

---

[1]All citations to the Certified Transcript of Record, compiled on July 18, 2009 shall be "Tr.[_ ]".

[2] At an earlier hearing on October 12, 2006, plaintiff was advised of his right to counsel and provided with a list of legal aid organizations. At the July 10, 2007 hearing, plaintiff, having been given an opportunity to obtain counsel, proceeded pro se.

II. <u>BACKGROUND</u>

Ernest Webber was born on July 2, 1961. He was forty-six years old on the date of his administrative hearing. (Tr. 23). Plaintiff has a high school diploma. (Tr. 23, 452). His past relevant work included work as a security guard. (Tr. 23, 62). <u>See</u> 20 C.F.R. 404.1565(a) and Social Security Ruling ("SSR") 96-8p[3].

A. <u>Medical Records</u>

a. <u>Back Injury</u>

Plaintiff worked eight years for Pratt & Whitney, assembling engine parts. On November 14, 1985, he incurred a back injury with a herniated nucleus pulposis[4] while lifting objects and had to quit. (Tr. 156-59, 211, 273, 296-B). On December 26, 1985, the injury was diagnosed as nerve root compression at the L5-S1 level on the left, though a CT scan performed on the outside of his injury at New Britain Hospital on December 26, 1985 was within normal limits. (Tr. 158, 162). Because of continuing pain, a lumbar myelogram and CT scan were performed at New Britain General Hospital on January 16, 1986 and an asymmetry to the right of the midline at the S1 nerve was detected, although no surgical intervention was indicated at the time. (Tr. 157).

---

[3]Available at
http://www.ssa.gov/OP_Home/rulings/di/01/SSR96-08-di-01.html.

[4]Defined as the elastic core inside each spinal disk.

Mr. Webber then worked as a security guard at Westfarms Mall for five years. (Tr. 252). He returned periodically to the New Britain Hospital with increasing pain bilaterally, each time renewing his prescriptions for Percocet. (Tr. 159-60, 211). On March 3, 1987, the plaintiff was given a second lumbar myelogram, CT scan that showed a pathology present at the L5-S1 level, indicating a herniated disc at L5/S-1 level. (Tr. 160, 164). The doctor recommended surgery in June of 1987, which he refused. (Tr. 160, 274, 455, 463). He continued working at Westfarms and returning to New Britain Hospital for his prescription refills through June 9, 1992. (Tr. 161).

The plaintiff went back to work at Pratt & Whitney in 1992 until March 1993, when he was laid off, mostly due to time missed because of his drug use. (Tr. 252, 274).

b. Endocarditis and Tricuspid Valve Replacement

The plaintiff went to the University of Connecticut Emergency Room on November 8, 1994, presenting hallucinations, shortness of breath, vomiting, abdominal pain, coughing, fever, chills, and weakness. (Tr. 206, 273). He was admitted to Intensive Care for pneumonia and severe bacterial endocarditis with complications of septic emboli, severe tricuspid regurgitation, renal insufficiency, hemoptysis[5], and exercise

_____

[5] Defined as the "spitting of blood derived from the lungs or bronchial tubes as a result of pulmonary or bronchial hemorrhage." Stedman's Medical Dictionary 781 (26th ed. 1995).

oxygen desaturation, brought about by his drug use. (Tr. 184, 190, 207). An echocardiogram revealed large vegetation on the tricuspid valve. (Tr. 184, 207, 273). He developed hemoptysis and gas exchange abnormalities and had "multiple bilateral mismatched defects consistent with embolization." (Tr. 184). He was hospitalized for two months, and left with significant tricuspid regurgitation, resultant right heart failure, and exertional dyspnea. (Tr. 184, 206). Since his ambulating desaturation was high, the plaintiff had to go home with an oxygen tank. (Tr. 208).

In August of 1995, the plaintiff's echocardiogram "demonstrated a progressive right ventricular dilation with increased pressures" and he was referred for surgical evaluation. (Tr. 180). On November 28, 1995, the plaintiff returned to the University of Connecticut Health Center for a pulmonary evaluation with regard to the possible tricuspid valve replacement procedure, where echos showed worsening right ventricular dilation and significant tricuspid regurgitation. (Tr. 184). He was recommended for the tricuspid valve replacement. (Tr. 187).

On January 2, 1996, the plaintiff was admitted to the University of Connecticut Hospital and underwent the tricuspid valve repair procedure with Dr. Boisoneau and Dr. B.C. Low. (Tr. 182). The day after surgery, he developed a right upper lobe

density and was extubated twice in the next two days. (Id.). His pain was an issue because he was so tolerant to narcotics that he required a significant amount for relief. (Id.). His condition improved and he was discharged on January 9, 1996. (Id.).

The plaintiff had a number of follow-up appointments with Dr. Radford, his cardiologist, at the University of Connecticut Health Center, including February 12, 1996 and again on December 23, 1996. (Tr. 166-173). His breathing was not significantly improved since the surgery, and Dr. Radford opined that he might have irreversible pulmonary disease. (Tr. 166).

On May 26, 2004, Dr. Anthony S. Lachman examined the plaintiff and opined that the plaintiff was completely recovered from endocarditis and the tricuspid valve replacement. (Tr. 280-81).

### c. Substance Abuse

The plaintiff is a recovering drug addict and admits to cocaine use for a total of three years, starting in 1984 and ending in 1987. (Tr. 210, 253). He became a heroin addict in 1992 or 1993, and used two to three bags of heroin per day. (Tr. 206, 306). He was arrested for heroin possession with intent to sell on July 27, 1993, and was on probation until September 15, 1995. (Tr. 253). His last usage was the day before his admission to the hospital on November 8, 1994. (Tr. 206, 253). As of the date of the July 10th hearing, he had been in a Methadone maintenance

program for his heroin addiction, remaining drug-free for nine years. (Tr. 468). The plaintiff testified that during those nine years he had periodic urinalysis which always came back clean. (Tr. 468). The plaintiff initially started Methadone while in the hospital in November 1994. (Tr. 206-08).

    d. <u>Other Impairments</u>

In addition to the back and heart conditions, plaintiff complains that he suffers from Hepatitis C, which makes him tired, and cluster migraines, which are "extremely painful" and make him nauseous. [Doc. #16 at 2]. As for the cluster migraines, the record reveals that they are self-reported. Medical records from 1996 reveal that Mr. Webber reported suffering from "intermittent severe headaches". (Tr. 166-167). In 2004, the plaintiff was admitted to the emergency room at the New Britain General Hospital following an automobile accident. (Tr. 289). The physician's notes indicate that the patient "self-diagnosed 'cluster migraines'". (Tr. 292).

Plaintiff also complains that he suffers from depression and experiences panic attacks.(Tr. 306). The record reflects that plaintiff has not has any psychiatric treatment or hospitalizations. (<u>Id.</u>). However, Dr. Pothiawala opined that by history he "may be suffering from panic disorder." (Tr. 307-308).

B. <u>Disability Determination</u>

The plaintiff began to receive disability benefits on October 9, 1994 because of a primary diagnosis of cardiomyopathy and a secondary diagnosis of disorders of the back. (Tr. 28). Since the plaintiff's health was expected to improve, his case was scheduled for periodic review to determine if his disability would continue. (Tr. 30). On February 11, 1997, his case was reviewed and his disability was continued. (Tr. 29). On October 22, 2004, the case was reviewed again and the plaintiff's disability was determined to have ceased as of October 1, 2004. (Tr. 34).

On March 23, 2005, the plaintiff met with Karen Seiler, a Disability Hearing Officer, for a disability reconsideration hearing. (Tr. 43). The officer reviewed the plaintiff's medical records and concluded that the plaintiff was not disabled. (Tr. 69). The officer found that the plaintiff had a medical improvement from the impairments present at the CPD for which he was previously disabled, because his tricuspid valve was stable and there was no sign of congestive heart failure. (Tr. 65-67). The officer determined that the plaintiff's RFC allowed him to stand or walk six out of eight hours, he could sit for six hours with customary breaks, he could lift or carry up to ten pounds frequently and up to twenty pounds occasionally, and did not have mental work-related restrictions. (Tr. 69). Therefore, the

plaintiff could do past relevant work and was not disabled. (Id.).

## C. Hearing Testimony

On July 10, 2007, the plaintiff appeared without counsel at a Video Hearing before ALJ Addison Masengill.[6] (Tr. 445). At the time of the hearing, Mr. Webber was forty-six years old. (Tr. 454).

Plaintiff graduated from high school, is right-handed, five foot ten and a half inches tall, and weighs about one hundred and eighty-one pounds. (Tr. 452-53). He testified that he had a deteriorating lower back condition for which he was supposed to have surgery in 1993, but never scheduled because he had to get a job. (Tr. 455, 463).

Plaintiff testified that his heart condition seems to have improved, though he was hospitalized in January 2007 when he was coughing up blood. (Tr. 456). His lungs were damaged in 1994 when he was hospitalized and bacteria damaged one of the valves in his heart. (Id.). The record suggests that one of the wires that was placed on his sternum during his heart surgery may have become infected, causing the coughing. (Tr. 458).

---

[6]The record indicates that the plaintiff rescheduled the hearing with the ALJ four times. He was originally scheduled to meet with the ALJ on August 29, 2006. On October 12, 2006, at a Video Hearing where the plaintiff appeared without counsel, the ALJ granted the plaintiff a continuance in order to get a representative.

Plaintiff also testified that he was supposed to start treatment for Hepatitis C, a condition that made him tired all of the time. (Tr. 474). In addition, he informed the ALJ that his recent physical at the methadone clinic indicated unusually high blood sugar levels and he was supposed to talk to a doctor about the possibility of diabetes. (Tr. 473-74).

Plaintiff also testified that he had been drug free for nine and a half years. (Tr. 459). He testified that he was currently taking six bottles of methadone daily, and he would like to eventually get off methadone. (Tr. 467). In addition, the plaintiff testified he suffers from constant pain in his lower spine, which he rated at a six without medicine and a four with medicine. (Tr. 459, 461). He was currently taking Naprosyn for the pain because he did not want to take narcotics. (Tr. 460). He stated that due to his back pain he cannot work, but he does not want to take narcotics because he does not want to become addicted again. (Tr. 463). He testified that his efforts to decrease the methadone dose were thwarted by his back pain. (Tr. 468).

Based on the plaintiff's testimony, his daily routine consists of building model ships, watching TV or movies, reading, and using his computer. (Tr. 461-62). Normally his girlfriend does the cooking, household cleaning, and washes his clothes. (Tr. 461). He is able to bathe, groom and dress himself, though

with pain. (Id.). He does not have a driver's license and must walk or catch a ride to get to church. (Tr. 454, 462). He does some stretching every day and attempts to exercise as much as the pain will allow him. (Tr. 462). At times, when he pushes himself and his breathing gets labored, he uses an oxygen concentrator. (Tr. 463). He testified that he could lift something as heavy as a gallon of milk, but only while standing, not bending. (Id.).

Mr. Webber stated that he has been depressed, though he does not have a diagnosis for his mental health condition and does not take any medication. (Tr. 464-65). He testified he has had thoughts of suicide, though he could never actually kill himself for religious reasons. (Tr. 465). He has been depressed since his mother died in 1979 and his depression had gotten worse recently when his father died of cancer. (Tr. 466-67).

At the hearing with the ALJ, a vocational expert, Ms. Kerry Quint, testified that she had reviewed the claimant's file and that there existed work in the local or national economy such that an individual with the claimant's age, education, and work experience would be able to do light work. However, that person would be unemployable if there were additional limitations due to problems with "cardiac symptoms, symptoms of depression and anxiety, with symptoms of chronic back pain" that would cause him to be off task at least twenty-five percent of the work day.

III. <u>DISABILITY AND THE ADMINISTRATIVE STANDARD OF REVIEW</u>

To be eligible for SSI, Mr. Webber must establish that he suffered from a disability within the meaning of the Social Security Act. "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Act does not contemplate degrees of disability or allow for an award based on partial disability. <u>Stephens v. Heckler</u>, 766 F.2d 284, 285 (7th Cir. 1985). Mr. Webber was disabled if his impairments were of such severity that he was unable to perform work that he had previously done, and if, based on his age, education, and work experience, he could not engage in any other kind of substantial gainful work existing in the national economy.  42 U.S.C. § 1382c(a)(3)(B); <u>Dumas v. Schweiker</u>, 712 F.2d 1545, 1550 (2d Cir. 1983); <u>Berry v. Schweiker</u>, 675 F.2d 464, 467 (2d Cir. 1982). Whenever plaintiff is partially, but not totally disabled by a medically determinable impairment or impairments, he is not disabled within the meaning of the Act. <u>Rodriguez v. Celebrezze</u>, 349 F.2d 494, 496 (1st Cir. 1965);

12

Robinson v. Celebrezze, 326 F.2d 840, 841 (5th Cir. 1964).

To evaluate Mr. Webber's case, the ALJ followed an eight-step evaluation process pursuant to 20 C.F.R. §§ 404.1594, to determine whether plaintiff continued to be disabled under the Act. First, the ALJ must determine if the claimant is engaging in substantial gainful activity. If the claimant is performing substantial gainful activity, then he is no longer disabled. Second, to continue disability, the claimant must have an impairment or combination of impairments that meets the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526. Third, the ALJ must determine whether there has been a medical improvement. 20 C.F.R. § 404.1594(f)(3). If there has been medical improvement, the analysis continues to the fourth step, otherwise, the analysis proceeds to the fifth step. Fourth, the ALJ must determine whether the medical improvement is related to the ability to work. If the medical improvement is related to the ability to work, the analysis continues to the sixth step. Fifth, if no medical improvement occurred, or if the medical improvement does not relate to the ability to work, the ALJ must determine whether an exception to medical improvement applies. If the first group of exceptions applies, the analysis proceeds to the next step, otherwise, if the second group of exceptions applies, the claimant's disability ends. If no exception applies,

the disability continues. At step six, the ALJ determines whether
all the current impairments are severe. If all the impairments in
combination do not limit the claimant's ability to do basic work
activities, the disability is discontinued. If the combination of
impairments limits the claimant's ability to do basic work
activities, the analysis continues. Seventh, the claimant's RFC
is assessed based on the current impairments to determine whether
he can perform past relevant work. 20 C.F.R. § 404.1594(f)(7).
Finally, in step eight, the ALJ determines whether other work
exists that the claimant can perform given his RFC and
considering his age, education, and past work experience. 20
C.F.R. § 404.1594(f)(8). If the claimant can perform other work,
he is no longer disabled; otherwise, his disability continues.
The burden of proof is on the claimant to prove disability but
shifts to Social Security Administration for the limited purpose
to provide evidence that demonstrates that other work exists in
significant numbers in the national economy that the claimant can
do, given his RFC, age, education, and work experience.

The ALJ's findings were unfavorable to the plaintiff.  He
found that the plaintiff had a medical improvement that was
related to Mr. Webber's ability to work. (Tr. 21).  The ALJ
further found that because of cluster headaches and a history of
degenerative disc disease, Mr. Webber had a residual functional
capacity to perform light work with additional limitations.  (Tr.

21). Based on the claimant's testimony, the medical evidence and testimony of the vocational expert, the ALJ concluded that as of October 1, 2004 the claimant's disability ended. (Tr. 24). In summary, the ALJ's findings were as follows:

1.  The most recent favorable medical decision finding that the claimant was disabled is known as the "comparison point decision" or CPD.

2.  At the time of the CPD, the claimant had the following medically determinable impairments: cardiomyopathy which met the severity requirements of Listing Section 4.07 for vascular heart disease of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d)).

3.  Through October 1, 2004, the date the claimant's disability ended, the claimant did not engage in substantial gainful activity (20 CFR 404.1594(f)(1)).

4.  The medical evidence establishes that, as of October 1, 2004, the claimant had the following medically determinable impairments: degenerative disc disease of the lumbar spine and migraine headaches.

5.  Since October 1, 2004, the claimant did not have an impairment or combination of impairments which met or medically equaled the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

6.  Medical improvement occurred as of October 1, 2004 (20 CFR 404.1594(b)(1)).

7.  The medical improvement is related to the ability to work because, as of October 1, 2004, the impairments present at the time of the CPD no longer met or medically equaled a listing (20 CFR 404.1594(c)(3)(i)).

8.  As of October 1, 2004, the claimant continued to have a severe impairment or combination of impairments (20 CFR 404.1594(f)(6)).

9.  Based on the impairments present as of October 1,

2004, the claimant had the residual functional capacity to perform light work. The claimant has the following additional limitations: simple unskilled tasks; no heights or ladders, ropes, scaffolding; no extreme cold, heat, or humidity, vibration, dust or gases; no overhead lifting, reaching; occasional ramps, stairs, stooping, bending, crouching, or kneeling.

10. As of October 1, 2004, the claimant was unable to perform past relevant work according to vocational expert testimony (20 CFR 404.1565).

11. On October 1, 2004, the claimant was a younger individual age 18-44 (20 CFR 404.1563).

12. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

13. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

14. As of October 1, 2004, considering the claimant's age, education, work experience, and residual functional capacity based on the impairments present as of October 1, 2004, the claimant was able to perform a significant number of jobs in the national economy according to vocational expert testimony (20 CFR 404.1560(c) and 404.1566).

15. The claimant's disability ended as of October 1, 2004 (20 CFR 404.1594(f)(8)).

(Tr. 20-24).

IV. <u>STANDARD OF REVIEW</u>

The Social Security Act provides for judicial review of the Commissioner's denial of benefits. 42 U.S.C. § 1383(c)(3). This is not a de novo review -- the Court may not decide facts, reweigh evidence or substitute its judgment for that of the

Commissioner.  See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993). Primarily, the Court reviews the decision to determine whether the Commissioner applied the correct legal standard. Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); see also Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987) (where the ALJ failed to apply correct legal principles, his finding cannot be upheld even if there is substantial evidence for it).

Secondly, the Court reviews whether the Commissioner's determination was supported by substantial evidence. Tejada, 167 F.3d at 773 . "Substantial evidence" is evidence that a reasonable mind would accept as adequate to support a conclusion; it is "more than a mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971), quoted in Pollard v. Halter, 377 F.3d 183, 188 (2d Cir. 2004).  The Court considers the entire administrative record, including new evidence submitted to the Appeals Council following the ALJ's decision.  Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996). To enable a reviewing court to decide whether the determination is supported by substantial evidence, the ALJ must set forth the crucial factors with sufficient specificity.  Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984).  This includes a determination that the testimony of any witness is not credible.  Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988).

V. <u>DISCUSSION</u>

As far as the Court can discern from plaintiff's filings, plaintiff raises two bases for reversing the ALJ's October 2004 finding of no disability. First, plaintiff argues that the ALJ's decision should be reversed because the medical examinations were brief and did not address his cardiac condition. Second, plaintiff argues that the ALJ failed to consider other medical impairments and symptoms plaintiff claims render him disabled in making the determination of his RFC. [Doc. #16].

A. <u>Plaintiff's Medical Examination</u>

Plaintiff argues that the medical evaluations he underwent were brief and did not address his cardiac condition, his main disability. Stated differently, plaintiff argues that the ALJ did not have sufficient evidence to conclude that a medical improvement occurred. Upon review, the Court disagrees.

In determining whether a claimant's disability continues or ends the ALJ assesses the claimant's medical improvement. A Medical Improvement is,

> any decrease in the medical severity of impairment(s) present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled and is determined by a comparison of prior and current medical evidence which must show that there have been changes (improvements) in the symptoms, signs or laboratory findings associated with that impairment(s). 20 C.F.R. § 404.1594(c)(1).

The ALJ's conclusion that a medical improvement occurred as of
October 1, 2004 that wa related to Mr. Webber's ability to work
is supported by substantial evidence. The record reflects that
plaintiff began to receive disability benefits as of October 1994
because of a primary diagnosis of cardiomyopathy. (Tr. 28). In
June 2004, Dr. Lachman, the plaintiff's cardiologist, wrote to
Dr. Piekarsky that he did not "understand why this man [Mr.
Webber] is on disability", given that Mr. Webber "had a valve
replaced in the tricuspid region, some nine years ago, and is a
fit individual." (Tr. 280). With respect to the cardiomyopathy,
Dr. Lachman opined that, "the first and second sounds are normal.
No gallops, murmurs, or rubs. Tricuspid valve appears stable."
(Tr. at 280). Dr. Lachman's conclusion is supported by the
absence of any record evidence between 1997 and 2004 that
plaintiff suffered any cardiac problems or sought any treatment
for his heart condition. At the hearing, plaintiff testified, in
response to questions regarding his heart condition, that "as far
as I know, they, they – from what I've been hearing, they said it
seems to sound okay." (Tr. at 45). Dr. Lachman's diagnosis and
the plaintiff's testimony are also consistent with the fact that
plaintiff is not taking any medication for his heart. (Tr. at
460). Plaintiff's argument that he did not get thoroughly
examined for his heart condition is unavailing in light of the
medical evidence to the contrary. Further, plaintiff had the

option to supplement the record with further evidence supporting his claims and did not do so.[7] As such, the ALJ's conclusion that plaintiff experienced a medical improvement is supported by substantial evidence.

B. Evaluation of Plaintiff's symptoms

Plaintiff argues that he suffers from a series of impairments, including Hepatitis C, panic attacks, frozen shoulder, lung infection, lower back injury, and cluster migraines,    the symptoms of which are severe enough to render him disabled.  The ALJ concluded that as of October 1, 2004, the "claimant continued to have a severe impairment or combination of impairments".  (Tr. at 21).

Consistent with the eight step evaluation, the ALJ performed a residual functional capacity assessment based on the current impairments.  The record before the Court supports the ALJ's conclusion that as of October 1, 2004, Mr. Webber had a residual functional capacity to perform light work and that, considering Mr. Webber's age, education, work experience and residual functional capacity based on the impairments present as of October 1, 2004, Mr. Webber is able to perform a significant

_____

[7] At the hearing, the ALJ reminded plaintiff that, "any and all these records, from any and all these doctors would be help - - very helpful in completing the record in this case so we would know what you do and do not have bothering you, okay?" (Tr. at 474).

number of jobs in the national economy.

In making a disability determination, all symptoms, including pain, must be considered.  20 C.F.R. § 404.1529(a). In evaluating subjective symptoms, a claimant's statements are to be considered only to the extent that they are consistent with medical evidence.  20 C.F.R. §§ 404.1529(a), 416.929(a). However, statements about the intensity and persistence of pain and symptoms will not be rejected simply because the objective medical evidence does not support the claim. 20 C.F.R. § 404.1529(c)(2). Other factors which will be considered include the claimant's medical history, diagnoses, daily activities, prescribed treatments, efforts to work, and any functional limitations or restrictions caused by the symptoms. See 20 C.F.R. § 404.1529(c)(3). In addition,

> [t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p[8].

The ALJ gave credit to the plaintiff's subjective complaints of pain insofar as they comport with the rest of the record. But, he found that the claimant's "statements concerning the

---

[8]Available at
http://www.ssa.gov/OP_Home/rulings/di/01/SSR96-07-di-01.html.

intensity, persistence and limiting effects of these symptoms are not credible as they are not supported by the medical record." (Tr. at 22). The ALJ's findings are consistent with the medical evidence in addition to evidence regarding the claimant's activities and lifestyle.

As stated earlier, Dr. Lachman, the cardiologist, opined that there were no signs of congestive heart failure, stating that, "[f]irst and second sounds are normal. No gallops, murmurs, or rubs." (Tr. at 280). Dr. Lachman further stated that the physical examination revealed no cyanosis[9] or dyspnea[10]. As for the back pain, Dr. Buckner's examination in 2005 concluded that Mr. Webber "ambulates slowly but without other apparent difficulty and does so also without an assistive device." (Tr. at 349-350). The medical report notes that, "tandem walk was performed without difficulty. The claimant is able to walk on his heels and toes without difficulty. However, he apparently was able to bend to only just above the knees. There is no spasticity, rigidity, involuntary movement, tremor or muscle asymmetry." (Tr. at 350). Dr. Buckner's observations are supported by Mr. Webber's testimony describing a range of daily,

---

[9] Defined as a "dark bluish or purplish coloration of the skin and mucous membrane due to deficient oxygenation of the blood". <u>Stedman's Medical Dictionary</u> 425 (26th ed. 1995).

[10] Defined as "[s]hortness of breath, a subjective difficulty or distress in breathing, usually associated with disease of the heart or lungs". <u>Stedman's Medical Dictionary</u> 535 (26th ed. 1995).

household and social activities in which he engages, which included sitting and building model ships, bathing, grooming and dressing himself, going to church, reading and watching movies. (Tr. at 461- 462).

As for the cluster migraines, the record reveals that despite self-reports of headaches, the CT scan of Mr. Webber's head was normal in 2005. (Tr. at 359). The physical residual functional capacity assessment performed by Dr. Malone, addressing the primary diagnosis of cluster headaches states that the claimant "gives a history of headaches which he has self diagnosed as cluster in type. He was seen in the ED on 04/17/04. CT of the head was normal, BP 142/80, normal PE." (Tr. at 299). Dr. Malone concludes that the "Claimant's symptoms are not fully supported by the objective evidence in MER." (Tr. at 302).

In light of the record, the Court finds that the ALJ's application of the legal principles regarding the plaintiff's symptoms and credibility was not error. An ALJ must use his discretion to determine a claimant's RFC and limitations on his RFC by evaluating and weighing the credibility of all testimony against medical and other evidence. Genier v. Astrue, 606 F.3d 46 at 49 (2d Cir. 2010).

Therefore, the Court finds no cause for reversal or remand.

## VI. <u>CONCLUSION</u>

Plaintiff's Motion to Reverse the Decision of the Commissioner or to Remand [Doc. #16] is **DENIED** and Defendant's Motion to Affirm the Decision of the Commissioner [Doc. #19] is **GRANTED**.

Any objections to this recommended ruling must be filed with the Clerk of the Court within ten (10) days of the receipt of this order. Failure to object within ten (10) days may preclude appellate review. <u>See</u> 28 U.S.C. § 636(b)(1); Rules 72, 6(a) and 6(e) of the Federal Rules of Civil Procedure; Rule 2 of the Local Rules for United States Magistrates; <u>Small v. Secretary of H.H.S.</u>, 892 F.2d 15 (2d Cir. 1989) (per curiam); <u>FDIC v. Hillcrest Assoc.</u>, 66 F.3d 566, 569 (2d Cir. 1995).

ENTERED at Bridgeport this 6th day of April 2011.

/s/
_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE
